# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 15, 2008

Charles R. Fulbruge III
Clerk

No. 06-30777

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

JAMIE EDELKIND

Defendant-Appellant

Appeals from the United States District Court
For the Western District of Louisiana

Before REAVLEY, SMITH, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

Defendant-appellant Jamie Edelkind ("Edelkind") appeals his conviction for having "wilfully fail[ed] to pay a support obligation with respect to a child who resides in another State, if such obligation has remained unpaid for a period longer than 2 years, or is greater than $10,000" in violation of 18 U.S.C. § 228(a)(3). Edelkind presents four issues on appeal: (1) whether the statute of limitations bars his conviction; (2) whether the district court abused its discretion in delaying the trial in violation of the Speedy Trial Act, 18 U.S.C. §§ 3161, et seq.; (3) whether the district court erred in its jury instructions on

1

"wilfulness"; and (4) whether there was sufficient evidence for the conviction.[1] For the following reasons, we reject appellant's arguments. The conviction is AFFIRMED.

## BACKGROUND

Jamie Edelkind, a computer technology expert, married Suzanne Boudreaux in 1988, who gave birth to their son, Sage, in 1993. The family lived primarily in Atlanta, Georgia, and Edelkind operated his own business. They had a lavish lifestyle. Edelkind and Boudreaux separated as a precursor to divorce in 1997, and they entered into a Settlement Agreement in 1998. The Settlement Agreement required that, aside from a few months early on, Edelkind would pay $1,400 a month in child support. However, litigation over various aspects of the divorce and agreement ensued. See, e.g., Edelkind v. Boudreaux, 519 S.E.2d 442, 443-44 (Ga. 1999). On September 15, 1999, with the issues finally resolved, a Georgia court entered a Final Judgment and Decree of Divorce in 1999. It incorporated by reference the terms of the 1998 Settlement Agreement, and the decision was made retroactive to 1998 ("1998 Judgment"). In the 1998 Judgment, the court found Edelkind "in willful contempt" of his child support obligations, and ordered him to repay his arrearage of $7,000 plus $300 of interest. The Georgia court found that Edelkind "has wholly failed to pay any amounts as child support to [Boudreaux] in the past five months while by his own testimony maintaining an affluent lifestyle and standard of living."

While litigation was pending before the Georgia courts, in 1998,

---

[1] Edelkind concedes the fifth issue he raises that the statute of conviction, 18 U.S.C. § 228, violates the Commerce Clause is foreclosed by United States v. Bailey, 115 F.3d 1222, 1224-26 (5th Cir. 1997), but he wishes to preserve it for Supreme Court review.

Boudreaux and Sage moved to Louisiana. Edelkind lived in Georgia until 1999 when he moved to Massachusetts after marrying his new wife, Linda, in 1998. After Boudreaux moved to Louisiana, Edelkind stopped paying child support.

In 1999, Edelkind sent a number of checks to satisfy his arrearage, all of which were returned for insufficient funds, and Boudreaux sought assistance from the state of Louisiana to obtain child support for Sage. Also in 1999, Edelkind declared bankruptcy, and Boudreaux eventually received a check from the bankruptcy court amounting to $9,622.97.

Edelkind continued to enjoy a lavish lifestyle in Massachusetts with his new wife, with whom he had three children. He lived in a mansion, drove expensive cars, hired two nannies, and sent his children to private schools. He marketed himself as a technology expert who owned several important patents. While these assets, including the home and cars, were paid for using his wife's name and accounts, Edelkind was heavily involved in the management of their joint finances.[2] Throughout this time, Edelkind did not fulfill his child support obligations and evaded garnishment by opening up bank accounts without using his social security number.

Boudreaux's efforts to enforce the child support obligations culminated in a 2003 hearing in a Louisiana state court for which both Bordeaux and Edelkind were present with counsel. At the hearing, Edelkind testified about his earning capacity and work history. After examining the evidence and testimony, the Louisiana state court found that "[i]f Mr. Edelkind would have conducted himself in an honest and forthright manner in his business and legal dealings, he would have no problem obtaining employment" and thereby fulfill his child

---

[2] He was later convicted of bank fraud in relation to the re-financing of his home. See United States v. Edelkind, 467 F.3d 791, 793-94 (1st Cir. 2006), cert. denied, 75 USLW 3530 (U.S. Apr. 2, 2007) (No. 06-9793).

support obligations. The Louisiana court entered a judgment in November 2003 ("2003 Judgment"), holding that Edelkind owed nearly $70,000 in back child support, and would have to pay approximately $1,500 a month from then on. To reach those sums, the Louisiana court recalculated the amount owed, based on findings regarding Edelkind's and Boudreaux's earning capacities. In so doing, the court rejected a litany of Edelkind's excuses, including ongoing troubles with the Securities & Exchange Commission. The court found Edelkind was "in contempt of court for his wilful and contumacious violation of the orders of the Court for failure to pay child support." It said the "arrearages in child support are particularly egregious." It also found that Edelkind "has put all of his assets beyond his creditors, including his ex-wife." Based on these findings, the court sentenced Edelkind to 90 days in jail, unless he would make an immediate payment of $25,000. After that hearing, Edelkind paid the $25,000, but after the hearing, he still did not consistently pay the child support that he owed.

On October 12, 2005, Edelkind was indicted for willfully failing to pay child support in violation of 18 U.S.C. § 228, from December 1998 to the date of the indictment. In late November 2005, the Government moved for a continuance, asserting that it was still waiting for certain sealed records to be provided by the Louisiana state courts, and that it was still verifying certain pieces of evidence. Edelkind opposed this motion, but after a pre-trial conference, the district court granted the motion. Edelkind then got a new lawyer, and eventually moved for a continuance of his own, which was also granted.

At trial, the foregoing story was presented. The Government also presented statements Edelkind allegedly told the FBI when he was interviewed: that Edelkind tried to hide money from Boudreaux by opening bank accounts

4

without using his social security number, and that he received compensation of at least $50,000 around mid-2000 to early-2001. The Government also presented evidence that Edelkind could use "Linda's" money as he saw fit, even though the funds were in her name. Taking into account all of the support payments actually made by Edelkind from January of 1999 forward, he owed nearly $90,000 at time of trial. The only documented support that he voluntarily paid since 1999 was $1,500 that he had a lawyer send.

After a series of pre-trial motions, the case was tried before a jury, and Edelkind was convicted. Following trial, Edelkind moved for a judgment of acquittal or new trial, which was denied. Edelkind was sentenced to 24 months imprisonment, the statutory maximum, and ordered to pay restitution of approximately $95,000. Edelkind filed a timely notice of appeal.

## STANDARD OF REVIEW

We review questions of law relating to statutes of limitations de novo. See United States v. Gunera, 479 F.3d 373, 376 (5th Cir. 2007). We review factual findings supporting Speedy Trial Act rulings for clear error, and legal conclusions de novo. See United States v. Stephens, 489 F.3d 647, 652 (5th Cir. 2007). Denials of proposed jury instructions are reviewed for abuse of discretion. See United States v. Cain, 440 F.3d 672, 674 (5th Cir. 2006). If properly preserved for appeal, we review sufficiency of the evidence claims de novo, though "in the light most favorable to the verdict"; otherwise, we review them under the "plain error"SSor "manifest miscarriage of justice"SSstandard. See United States v. Morganfield, 501 F.3d 453, 461 (5th Cir. 2007) (internal citations and quotations omitted).

## ANALYSIS

I. Statute of Limitations

Edelkind contends that his willful failure to pay child support is not a continuing offense, and, consequently, he could have been convicted for acts that were outside the statute of limitations. The pertinent statute states that any person who "wilfully fails to pay a support obligation with respect to a child who resides in another State, if such obligation has remained unpaid for a period longer than 2 years, or is greater than $10,000" is guilty of a crime. 18 U.S.C. § 228(a)(3).

The statute is subject to the general five-year statute of limitations provided for under 18 U.S.C. § 3282(a), because section 228 does not contain a specific limitations period. See United States v. Monts, 311 F.3d 993, 999 (10th Cir. 2002). Edelkind argues that the crime is complete when the child support payments reach 2 years or is greater than $10,000 and the statute of limitations starts to run at that point. Here, the payments reached $10,000 at the latest, on October 1, 1999. Edelkind argues that the statute of limitations period ended on October 1, 2004, and therefore the October 12, 2005 indictment was untimely. In response, the Government contends that the violation is a continuing offense and a "continuing offense, by its very nature, does not terminate until the date of the indictment or the voluntary termination of the illegal activity." United States v. Alvarado-Santilano, 434 F.3d 794, 796 (5th Cir. 2005) (internal quotation omitted). According to the Government, since Edelkind has never fully paid his arrearage in child support payments, the offense terminated only at the date of indictment.

In United States v. Brazell, 489 F.3d 666, 668 (5th Cir. 2007), we stated, "[a] defendant's continual wilful failure to satisfy his child support debt . . . constitutes a continuing offense." Edelkind argues that Brazell does not control

this case for two reasons: (1) the statement is mere dictum; and (2) Brazell concerned the application of a sentence enhancement for the continued failure to pay child support while on probation but this case concerns the statute of limitations period for failure to pay child support. See Brazell, 489 F.3d at 667-68. Assuming arguendo that the language in Brazell has only persuasive value, we still conclude that 18 U.S.C. § 228(a) is a continuing offense for statute of limitations purposes.

First, other Circuit decisions that have directly addressed this issue in other legal contexts are in agreement with Brazell that section 228(a) is a continuing offense. See, e.g., United States v. Russell, 186 F.3d 883, 886 (8th Cir. 1999) (Ex Post Facto Clause); United States v. Muench, 153 F.3d 1298, 1301 (11th Cir. 1998) (venue); United States v. Crawford, 115 F.3d 1397, 1405 (8th Cir. 1997) (venue). Moreover, the majority of state courts that have addressed this issue agree that the wilful failure to pay child support is a continuing violation. See Harvill v. Texas, 13 S.W.3d 478, 481 (Tex. Ct. App. 2000) ("Criminal nonsupport is a continuing offense."); Wisconsin v. Monarch, 602 N.W.2d 179, 182 (Wis. Ct. App. 1999) ("These cases establish that the crime of nonsupport continues until the last date the defendant intentionally fails to provide child support that he or she is legally obligated to provide. The statute of limitations runs from that point."); Maryland v. James, 100 A.2d 12, 14 (Md. 1953); Minnesota v. Wood, 209 N.W. 529, 530 (Minn. 1926); see also Toussie v. United States, 397 U.S. 112, 134 (1970) (White, J., dissenting) ("The 'continuing offense' is hardly a stranger to American jurisprudence. The concept has been extended to embrace such crimes as embezzlement, conspiracy, bigamy, nuisance, failure to provide support, repeated failure to file reports . . . .")

7

(emphasis added) (citing Towns v. Georgia, 100 S.E. 575 (Ga. Ct. App. 1919); but see People v. Monaco, 710 N.W.2d 46, 56-57 (Mich. 2006) (holding, by a divided court, that Michigan's legislature did not intend the criminal nonsupport of children offense to be a continuing one).[3]

Second, the statutory language and Congressional intent support a conclusion that a 18 U.S.C. § 228(a) violation is a continuing offense. See Toussie, 397 U.S. at 114-15 ("[A] particular offense should never be construed as a continuing one . . . unless the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one."). The nature of a continuing offense is that "each day's acts bring a renewed threat of the substantive evil Congress sought to prevent." Id. at 122. From a plain reading of the statute, Congress clearly intended the offense to be a continuing one. The statute punishes the failure to pay child support if such an obligation "remained unpaid for a period longer than 2 years, or is greater than $10,000." 18 U.S.C. § 228(a) (emphasis added). Congress thereby imagined the criminalized conduct to last continuously beyond a 2-year period or the accumulation over $10,000.

In addition to this statutory language, Congress' overriding concern when enacting the bills[4] that resulted in 18 U.S.C. § 228 was two continuing harms --

---

[3] A strong majority of the state courts is significant in this context because Congress's driving concern when enacting 18 U.S.C. § 228(a) was to strengthen the enforcement of state crimes of wilful failure to pay child support when a parent crosses state lines. See Bailey, 115 F.3d at 1225.

[4] The Child Support Recovery Act of 1992 ("CSRA") created federal penalties for failure to pay child support. This Act was later amended by the Deadbeat Parents Punishment Act of 1998 ("DPPA"). See United States v. Kukafka, 478 F.3d 531, 534 (3d Cir. 2007). "The
(continued...)

(1) parents shirking the "burden" and the "moral, legal and financial obligations" to their own children and (2) the negative effect on the custodial parents who must continually renew their tedious efforts to enforce support orders against out-of-state non-custodial parents. See H.R. Rep. No. 102-771, at 6 (1992) ("[T]he burden of caring for these children will be placed on the shoulders of the parents -- where it rightfully belongs."); 144 Cong. Rec. H3042-01, H3045-46 (daily ed. 1998) (statement of Rep. Roukema); Id. at H3043 (statement of Rep. Jackson-Lee) ("In many instances, women or men with custody who have to rely upon the civil process system time after time after time find that the parent that owes the money does not pay child support many times."); see also 138 Cong. Rec. H7324-01, H7327 (daily ed. 1992) (statement of Rep. Hoyer) (noting the effect of the law was to criminalize a person neglecting to pay his child support obligation for over six years). Congress thereby intended the criminal penalties to prevent the continuous harm to the custodial parent and his or her child's welfare that is renewed each day by the "deadbeat" parent's daily failure to pay child support. It is the nature of child support that it typically arrives periodically to cover the living expenses of a child during the intervals between payments, so the failure to continue to make payments does "bring a renewed threat of the substantive evil Congress sought to prevent." Toussie, 397 U.S. at 122. Moreover, Congress intended the statute to penalize parents who intentionally flee across state lines so as to continuously evade enforcement of child support orders by out-of-state courts. E.g., 138 Cong. Rec. H7324-01, H7326 (daily ed. 1992) (statement of Rep.

---

(...continued)
DPPA is the successor to the Child Support Recovery Act . . . . The operative language of the CSRA is substantively the same as the DPPA. Thus, cases interpreting and applying the CSRA are applicable to this case, and we cite those cases herein as if they were DPPA cases." United States v. Kerley, 416 F.3d 176, 178 n.1 (2d Cir. 2005). The codification of these Acts is the criminal statute in this case, 18 U.S.C. § 228.

Hyde).  Congress thereby characterized a 18 U.S.C. § 228 violation as an intentional and continual evasion of court processes, which is generally a continuous offense.  See United States v. Merino, 44 F.3d 749, 754 (9th Cir. 1994). Like those who flee and evade court processes, the consistent failure to pay ongoing child support obligations as ordered by state courts is a "threat to the integrity and authority of the court, posed by a recalcitrant defendant who refuses to abide by lawful court orders."  Id.

Furthermore, under Edelkind's theory, the crime is complete whenever $10,000.01 is owed.  Under his theory, if a defendant owes, for example, $11,000 a month in support, and refuses to pay, the crime is complete every single month.  In one year, the defendant could conceivably be responsible for twelve separate crimes of $11,000, each carrying with it a potential sentence of up to 24 months for a total of a 264 months maximum.  Under a "continuous offense" approach, however, the defendant would only be accountable for one continuous crime involving losses of $132,000, and would be subject to just a 24 month maximum sentence.  Congress clearly did not intend to attach lengthy jail-times for this crime, but merely wanted to use the threat of a two-year maximum to create an incentive for "deadbeat" parents to fulfill their ongoing obligations to their children.  See, e.g., 144 Cong. Rec. S5734-02, S5734 (daily ed. 1998) (statement of Sen. Kohl).[5]

Against these authorities, Edelkind argues that under Toussie and United States v. Irvine, 98 U.S. 450 (1878), a section 228(a) violation should not be

---

[5] Since we find Congress's intent to be unambiguous, we do not need to follow the "rule of lenity."  See United States v. Lamm, 392 F.3d 130, 134 (5th Cir. 2004) ("[Rule of lenity] requires an ambiguity in a criminal statute be resolved in favor of the defendant when there is a 'grievous ambiguity or uncertainty' in the statute.") (citing Muscarello v. United States, 524 U.S. 125, 138-39 (1998) (citations omitted)).

deemed a continuing offense. Toussie concerned whether the requirement to register for the draft constituted a continuing offense. In Toussie, the Government "argued that [the crime] continued to be committed each day that Toussie did not register," 397 U.S. at 114, a proposition the Court rejected. The draft registration statute did not, the Court ruled, expressly make the crime continuing, and "[t]here is also nothing inherent in the act of registration itself which makes failure to do so a continuing crime. Failing to register is not like a conspiracy which the Court has held continues as long as the conspirators engage in overt acts in furtherance of their plot." Id. at 122. The fact that the first draft registrations clearly were viewed as instantaneous events, i.e., the registration period was limited to six days, and not a continuing process indicated to the Court that "there is nothing inherent in the nature of failing to register that makes it a continuing offense. " Id.

In Irvine, "[t]he defendant, Clark Irvine, [wa]s charged in the indictment . . . , that on the twenty-fourth day of December, 1870, as the agent and attorney of Mrs. Berkely, he wrongfully withheld from her the amount of her pension, to wit, $525 . . . and continuously withheld it until the time of finding the indictment in September, 1875." 98 U.S. at 451. The question was whether constant withholding of the money extended the statute of limitations. The Court held it did not, stating that "[w]henever the act or series of acts necessary to constitute a criminal withholding of the money have transpired, the crime is complete, and from that day the Statute of Limitations begins to run against the prosecution." Id. at 452. "It is unreasonable to hold that twenty years after this he can be indicted for wrongfully withholding the money, and be put to prove his innocence after his receipt is lost, and when perhaps the pensioner is dead . . . ." Id.

These cases are distinguishable. Unlike in Irvine and Toussie, the statute here, does "clearly contemplate[] a prolonged course of conduct," Toussie, 397 U.S. at 120, as it typically takes many months, if not years, of missed payments to reach $10,000, and, in fact, the statute explicitly speaks of, in the alternate, a "period longer than 2 years," suggesting prolonged conduct. This is unlike cases where a single act (such as withholding of a single pension payment, or failing to register within the six-day period), is the basis for the crime, as the obligation and potential harm here constantly increases by the imposition of a series of clearly defined new duties SSi.e., the monthly duty to pay the new month's check SS coupled with a series of overt failures to meet those new duties. In reaction to Toussie, Congress changed the registration statute so as to impose a duty to register beyond the six-day time-frame. Like child support obligations, Congress thereby imposed a continuing obligation to register for the draft. Consistent with our holding today, courts consider the violation of the continuous registration obligation as a continuing offense. See United States v. Kerley, 838 F.2d 932, 935 (7th Cir. 1988); United States v. Jacob, 781 F.2d 643, 648-49 (8th Cir. 1986); United States v. Eklund, 733 F.2d 1287, 1297-298 (8th Cir. 1984) (en banc) (noting that "failure to fulfill that continuing duty is a continuing offense."). Unlike Irvine, we are not applying the "continuous offense" doctrine to the continued effects of a discrete and completed crime, i.e., the continued denial of receipt of one check after failing to deliver that one check within the proscribed time period. Instead, here, the defendant is continuing to renew his failure to fulfil his obligations every single month (and renewing its harm) akin to a co-conspirator continuously renewing his support for and furthering the harms of a criminal conspiracy. See, e.g., Bramblett v. United States, 231 F.2d 489, 492-93 (D.C. Cir. 1956) (distinguishing Irvine from

conspiracies, which are considered continuing offenses). Our holding today that a 18 U.S.C. § 228 violation is a "continuing offense" is consistent with Toussie and Irvine.[6]

2. Speedy Trial Act

Under the Speedy Trial Act, 18 U.S.C. §§ 3161(c)(1), et seq., a defendant should be brought to trial within 70 days of his indictment unless an exception applies. One exception is:

> Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial.

18 U.S.C. § 3161(h)(8)(A). The statute also goes on to list the types of factors the court must consider in granting a continuance, including: "[w]hether the case is so unusual or so complex. . . that it is unreasonable to expect adequate preparation . . . within the time limits established by this section." § 3161(h)(8)(b)(ii). The district court has "discretion SS within limits and subject to specific procedures SS to accommodate limited delays for case-specific needs." Zedner v. United States, 547 U.S. 489, 499 (2006). In prior cases, we have concluded that a district court's finding that a case is complex constitutes a sufficient ground to satisfy the statutory requirements for a continuance. United States v. Bieganowski, 313 F.3d 264, 282 & n.15 (5th Cir. 2002). For this court

---

[6] Edelkind also contends the jury instruction was in error, because of the erroneous instruction on the application of the statute of limitations to his offense, an argument that we dismiss in this section. Because § 228(a) is a continuing offense statute, we need not decide whether the jury could have found Edelkind guilty even if § 228(a) is not a continuing offense statute as the defendant contends.

to overturn a factual finding, such as the district court's factual finding that the case is complex, it must be for "clear error." Stephens, 489 F.3d at 652.

At a pre-trial conference, the Government explained that the case was complex, involved voluminous documents (some not yet received, because they were under seal), and would involve "other crimes evidence" under Rule 404(b). The district court agreed that the case was complex, because many documents were involved. The district court also agreed that the Government was in good faith still waiting on documents after taking judicial notice of the fact that the Louisiana courts were still recovering from Hurricanes Katrina and Rita. During the continuance hearing, Edelkind's counsel also acknowledged that "the case [was] becoming complicated." At oral argument, Edelkind's appellate counsel agreed with this statement, and conceded that the factual and procedural history of the case was "long and complicated." Thus, there is sufficient basis for the district court's conclusion that the case is complex; there is no clear error.

## 3. Jury Instruction on "Wilfulness"

Edelkind argues that the district court abused its discretion in declining to offer his proposed jury instruction regarding wilfulness. "The district court retains substantial latitude in formulating its jury charge, and we will reverse only if the requested instruction is substantially correct; was not substantially covered in the charge as a whole; and if the omission of the requested instruction seriously impaired the defendant's ability to present a given defense." Cain, 440 F.3d at 674 (internal quotations and citations omitted). Any error is subject to harmless error review. United States v. Nguyen, 493 F.3d 613, 622 (5th Cir. 2007).

Edelkind argues that the court abused its discretion when it declined to charge the jury that if they "f[ou]nd that the defendant had a good faith belief

that he is not obligated to pay a portion of his child support, such a belief is a defense to a 'finding of wilfulness' even if that belief is unreasonable." Instead, the district court merely stated that "wilfully . . . means that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law. . . ." Moreover, the court said that "[i]f you find that it was proven that the defendant had money which he used to pay other expenses beyond living expenses instead of paying his child support, then the wilful element is satisfied." The district court also noted that "this element is satisfied if you find that the defendant had the ability to pay part of his child support, even if he did not have the entire amount which he was ordered to pay," or that "the defendant['s] lack of funds to pay was the result of his voluntary and intentional acts done without justification."

Edelkind does not present a valid argument as to how "the omission of the requested instruction seriously impaired the defendant's ability to present a given defense." Cain, 440 F.3d at 674. Edelkind testified that he believed the 1998 Judgment was invalid because, according to his belief, Boudreaux had violated the judgment by mortgaging their previous home. Edelkind now suggests that the failure to give the proposed instruction impaired his ability to contend that he had a good-faith, albeit unreasonable, belief that he did not wilfully violate the child support order because he believed the order was no longer binding. However, this defense, as a matter of law, is not a valid defense. Edelkind's proposed instruction would apply if his defense had involved ignorance of what the law actually required. See United States v. Mathes, 151 F.3d 251, 254-55 (5th Cir. 1998). Here, Edelkind's defense does not involve the ignorance of what the law actually required when the law itself was unclear, but

15

an unreasonable self-belief that a known court order was invalid and thereby not binding on him. In Bailey, we explicitly rejected any defense against a section 228 prosecution by challenging the validity of the underlying state court order. 115 F.3d at 1232. We said:

> A CSRA prosecution turns only on the defendant's violation of a state court order. It does not turn on the fairness of the order, the reasons underlying the state court's issuance of the order, the defendant's relationship with his children or former spouse, or any other matter involving relitigation of a family law issue. Moreover, there is no language in the CSRA allowing the federal court to look beyond the four corners of the state child support order or permitting the defendant to collaterally attack the state court order in federal court.

Id.; see also Kerley, 416 F.3d at 178 ("Every circuit that has addressed the issue has stated that defendants in DPPA prosecutions cannot collaterally challenge the substantive merits of the underlying support order."). Accordingly, the omission of Edelkind's proposed jury instruction did not seriously impair Edelkind's presentation of the given defense because it was not a valid defense as a matter of law.

4. Sufficiency of Evidence

"We review a claim of insufficient evidence by viewing all of the evidence, and all reasonable inferences that may be drawn from it, in the light most favorable to the verdict." United States v. Jimenez, 509 F.3d 682, 690 (5th Cir. 2007).[7] The defendant's main argument is that Boudreaux's actions and other events outside of his control rendered him unable to pay the child support

---

[7] The Government and Edelkind dispute whether the sufficiency of evidence challenge should be reviewed de novo or under a plain error standard. We do not need to decide this issue, because our conclusion that there is sufficient evidence for the conviction is valid even under the de novo standard.

payments, and therefore the jury should not have concluded that he wilfully failed to pay child support. Mathes, 151 F.3d at 254; see also United States v. Mattice, 186 F.3d 219, 228 (2d Cir. 1999) ("[I]f a defendant is unable to pay even some of his past due child support obligations, his failure to pay cannot be either voluntary or intentional and thus cannot be willful within meaning of [18 U.S.C. § 228(a)].") . Edelkind also suggests the evidence of his ability to pay erroneously relies on his current wife, Linda's, ability to pay the child support payments.

We have said that "while [the defendant] may not have willfully failed to pay the full amount of child support arrearages that he owed, he could have willfully failed to pay the lesser amount that he was capable of paying; that lesser amount fits the CSRA's definition of support obligation, which includes any amount due pursuant to court order that has remained unpaid . . ." Mathes, 151 F.3d at 254. Moreover, as the Ninth Circuit has noted, "Congress did not mean to let absentee parents evade their parental obligations by refusing to accept gainful employment or take other lawful steps to obtain the necessary funds." United States v. Ballek, 170 F.3d 871, 873 (9th Cir. 1999); see also United States v. Williams, 121 F.3d 615, 621 (11th Cir. 1997) ("[A]lthough Appellant lacks the funds to pay [his child-support obligations], it is due solely to his decision to take steps specifically calculated to eliminate his ability to do so."). Furthermore, "[i]t makes no difference from what source [the defendant] . . . received income. What matters is that he . . . had income, in whatever form he wishes to characterize it." United States v. Harrison, 188 F.3d 985, 987 (8th Cir. 1999) (quoting United States v. Black, 125 F.3d 454, 465-66 (7th Cir.1997)). There is also some deference to a state court's assessment of the defendant's ability to pay. See, e.g., United States v. Craig, 181 F.3d 1124, 1129 (9th Cir. 1999). Moreover, even after the 2003 Judgment, Edelkind never sought a

modification of the child-support order based on his alleged inability to pay. Id. at 1128-29 ("We are confident that a competent state tribunal would have made a proper evaluation of his mournful apologia had it been presented to a family court prior to his federal indictment. He chose not to do so. Accordingly, by the time he was the subject of a federal indictment, it was too late to avoid the consequences by pleading financial inability to pay the state court order.").

Here, a state court in 2003 had determined after a hearing that Edelkind had the ability to pay his child support obligations and his arrearage; it also found his litany of excuses unavailing. Subsequently, he never sought to modify his child support obligations. The Government presented evidence that Edelkind was highly educated, had gainful employment for significant amounts of time at high salaries, had alleged that he had important patents, and lived a life with a high standard of living. He was, thus, more than capable of accepting gainful employment to pay at least some significant portion of his child support obligations. There is also evidence that he intentionally avoided paying his child-support obligation (presumably, he thus believed he was capable of paying at least some portion of it) by purposely moving money around so as to avoid garnishment. There is sufficient evidence to support the verdict.

CONCLUSION

For these reasons, the judgment of the District Court is AFFIRMED.

18