**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 15, 2011

No. 10-60944

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee

v.

TELANDRA GAIL JONES; THEDDIS MARCEL PEARSON,

Defendants–Appellants

Consolidated with 11-60159

UNITED STATES OF AMERICA,

Plaintiff–Appellee

v.

THEDDIS MARCEL PEARSON,

Defendant–Appellant

Appeals from the United States District Court
for the Southern District of Mississippi

Before SMITH, PRADO, and ELROD, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

This appeal arises out of the nearly month-long trial of Telandra Jones,
Theddis Pearson, and five other defendants for Medicare fraud and related

No. 10-60944

crimes stemming from the practices of their business, Statewide Physical Medicine Group. The Appellants used unauthorized personnel to perform physical rehabilitation on Medicare patients and then billed Medicare at an inflated rate for those treatments. The jury convicted Pearson of five counts of health care false statements and one count each of theft of government funds and money laundering. Jones was convicted only of theft of government funds and money laundering. Because we find that the verdict form used by the district court lowered the level of *mens rea* required to convict Pearson of health care false statements, we REVERSE his convictions on those counts. On all other claims raised by the Appellants, we find no reversible error and therefore AFFIRM Jones's and Pearson's convictions for theft of government funds and money laundering.

## I. BACKGROUND

### A.    Factual Background

In June 2000, Telandra Jones and Theddis Pearson (collectively, the "Appellants") along with Jones's brother, Alonzo Williams, opened Statewide Physical Medicine Group ("Statewide") in Mississippi. Pearson became the chief executive officer and was in charge of setting up the business and overseeing the day-to-day operations. Jones, who worked out of Dallas, Texas, became the chief financial officer and was in charge of billing. Statewide operated as a physical rehabilitation provider for Medicare patients. Since Statewide operated in Mississippi, Cahaba, Medicare's regional fiscal carrier for Mississippi, oversaw the claims submitted by Statewide.

Statewide's business model was to have doctors evaluate patients to see whether they had a need for therapeutic exercise. If such treatment was ordered by the doctor, then Statewide would have its personnel go into the patient's home and provide the treatment. The treatment was administered generally by kinesiotherapists ("KTs") hired by Statewide. KTs typically have four-year

2

No. 10-60944

college degrees but there were at least three Statewide employees who provided treatment who did not have a four-year degree. The physicians who ordered the treatment were not physically present when Statewide's employees went into patients' homes and provided the treatment.

In providing treatment in this way, the Appellants sought to rely on Medicare's general supervision exception. Section 410.26 of Title 42 of the Code of Federal Regulations requires that, in order to bill Medicare, either a physician must render the service provided or the service provided must be performed under a physician's direct supervision. According to section 410.32, direct supervision does not mean that the physician must be present in the same room with the rendering personnel, but the physician must be present in the building and immediately available to provide assistance and direction throughout the time the rendering personnel is performing services. There is one relevant exception to this requirement of direct supervision. Where either (1) the provider is serving homebound patients in medically underserved areas where there are no available home health services or (2) the service is an individual or intermittent service performed by personnel meeting pertinent state requirements and the service is an integral part of the physician's service to the patient, only "general supervision" is required. That is, the physician need not be physically present at the patient's residence when the service is performed; however, the service must be performed under his/her overall supervision and control. Though there were home health services available in the areas that Statewide served, the Appellants claim that they were permitted to provide general supervision treatment under another exception that allowed treatment in spite of the existence of home health services where the patient has exhausted home health benefits under Medicare.

After an in-home treatment was provided, the Statewide employee who provided the treatment would prepare a "treatment sheet," which the doctor who

ordered the treatment would later review and approve. Secretaries in the individual Statewide offices—Laurel, Jackson, Moss Point, Meridian, and Hattiesburg, Mississippi and York, Alabama—would enter the treatment data from the treatment sheets into a billing sheet by adding up the number of checkmarks, each of which indicated a treatment administered. The billing sheet was sent to Jones in Dallas, where she reviewed it and sent it on to Cahaba. Jones billed Medicare for the treatments provided based on the area of the body treated and not by time intervals.

## B.    Proceedings Below

The Government indicted the Appellants in the Jackson Division of the Southern District of Mississippi in February 2009. On October 15, 2009, the Government obtained a Rule 48(a) dismissal from the Jackson Division. Five days later, the Government obtained an indictment against the Appellants, Williams, and four doctors associated with Statewide in the Hattiesburg Division. Appellants were charged with conspiracy to commit Medicare fraud (Count 1), Medicare fraud (Counts 2–6), healthcare false statements (Counts 7–11), theft of government funds (Count 12), and money laundering (Count 13). The prosecution focused primarily on two issues. First, the Government alleged that Statewide had billed for services to patients in their homes by persons who were not sufficiently licensed or qualified to provide services at a time when a doctor was not physically present. And second, the Government alleged that it was impermissible for Statewide to bill certain services by area of the body, as opposed to by time unit.

After the Government rested, the Appellants moved for a judgment of acquittal, which the district court denied. Appellants renewed their motions after the close of their evidence, and the district court again denied them. The jury found Pearson guilty of making health care false statements (Counts 7–11) and Jones and Pearson guilty of theft of government funds (Count 12) and

No. 10-60944

money laundering (Count 13). Both Jones and Pearson were acquitted of the remaining counts, as were the other defendants. Jones was sentenced to 120 months of imprisonment for each of Counts 12 and 13, to run concurrently, to be followed by three years of supervised release. Jones was ordered to pay $18,064,447.73 in restitution and a $200.00 special assessment. Pearson also was sentenced to a total of 120 months of imprisonment: 60 months for Counts 7–11, 120 months for each of Counts 12 and 13, to run concurrently, to be followed by three years of supervised release. Pearson was ordered to pay $18,064,447.73 in restitution and a $700.00 special assessment. The district court also entered a forfeiture order as to both defendants. The Appellants timely appealed, invoking our jurisdiction under 28 U.S.C. § 1291.

## II. DISCUSSION

### A.    Dismissal of the First Indictment

The Appellants argue that it was error for the district court to have permitted the Government to dismiss the First Indictment against them because they claim the Government sought the dismissal in bad faith. Additionally, they claim it was erroneous for the district court to have dismissed the First Indictment without giving the Appellants notice and an opportunity to be heard. Rule 48(a) of the Federal Rules of Criminal Procedure allows the government to dismiss an indictment "with leave of court." This "leave of court" requirement "has been interpreted 'to allow the courts to exercise discretion over the propriety of a prosecutorial motion to dismiss.'" *United States v. Welborn*, 849 F.2d 980, 983 (5th Cir. 1988) (quoting *United States v. Salinas*, 693 F.2d 348, 351 (5th Cir. 1982)). The primary intent of the "leave of court" requirement is to "protect the defendant against prosecutorial harassment." *United States v. Hamm*, 659 F.2d 624, 628 (5th Cir. 1981) (en banc). We review the district court's decision to grant the Government's request for a dismissal under Rule 48(a) for abuse of discretion. *United States v. Salinas*, 701 F.2d 41, 42 (5th Cir.

5

1983). But, we have noted that "[t]he exercise of [the Executive's] discretion with respect to the termination of pending prosecutions should not be judicially disturbed unless clearly contrary to manifest public interest." *United States v. Cowan*, 524 F.2d 504, 513 (5th Cir. 1975).

### 1.    Bad Faith

Appellants allege that the Government acted in bad faith when, instead of seeking a superseding indictment in the Jackson Division of the Southern District of Mississippi, it filed a Second Indictment in the Hattiesburg Division. Appellants contend that this was done to obtain a whiter jury pool; Pearson is African-American. "Bad faith arises when the prosecution is motivated by considerations clearly contrary to the public interest and the public interest is not served by harassing a defendant. When a court considers a prosecutor's motion to dismiss it must begin with the presumption that the prosecutor acted in good faith." *Welborn*, 849 F.2d at 983 (internal quotation marks and citations omitted). "Although the burden of proof is not on the prosecutor to prove that dismissal is in the public interest, the prosecutor is under an obligation to supply sufficient reasons[—]reasons that constitute more than a mere conclusory interest." *Salinas*, 693 F.2d at 352 (internal quotation marks and footnotes omitted). In the Second Indictment, the Government added five additional defendants and the geographic scope of the prosecution widened. The Government justified the dismissal based on the geographic center of the charges after the Second Indictment being in Hattiesburg. This rationale is more than a "mere conclusory interest." It was, therefore, not an abuse of discretion for the district court to have allowed the dismissal of the First Indictment.

### 2.    Procedural Due Process

The Appellants claim that their procedural due process rights were violated because the district court allowed the Government to dismiss the First Indictment without affording the Appellants notice of or a hearing on the

dismissal.   The framework for a procedural due process inquiry is a familiar one.  We first ask "'whether there exists a liberty or property interest which has been interfered with by the State.'"  *Meza v. Livingston*, 607 F.3d 392, 399 (5th Cir. 2010) (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).  If such a liberty or property interest exists, we then consider "'whether the procedures attendant upon that deprivation were constitutionally sufficient.'"  *Id.* (quoting *Thompson*, 490 U.S. at 460).  In assessing whether the procedures were constitutionally sufficient, we evaluate three factors: (1) private interest, (2) risk of error, and (3) governmental interest.  *Id.* at 402 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

The Appellants claim that the liberty interest embodied in Rule 48(a) is one to be free from prosecutors "charging, dismissing and re-charging without placing a defendant in jeopardy."  *United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965)).  Assuming *arguendo* that this is a liberty interest protected by the Due Process Clause, such an interest would only be implicated on re-indictment, not at dismissal.   Once the government obtains a dismissal from the district court, the question remains as to whether the government will re-file.  If it does not re-file, then the only consequence to the defendant of dismissal is that there are no longer charges pending.  If the government does re-file, the claimed liberty interest to be free from "prosecutorial harassment" once again attaches, but at the time of the dismissal, there is no negative consequence that can befall the defendant.  *See United States v. Comeaux*, 954 F.2d 255, 261 (5th Cir. 1992); *see also Parr v. United States*, 351 U.S. 513, 516–17 (1956).

In this case, the Government dismissed the First Indictment in the Jackson Division of the Southern District of Mississippi and then filed the Second Indictment five days later in the Hattiesburg Division.  Appellants challenged the Second Indictment in Hattiesburg by moving to transfer the case back to the Jackson Division.  The district court held a hearing on Appellants'

argument that the First Indictment was dismissed in bad faith and found that there was no cause to transfer the case and also that there was no bad faith. This was  constitutionally sufficient process. *See Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971).  Therefore, there was no deprivation of the Appellants' procedural due process rights.

## B.    Evidentiary Rulings

The Appellants argue that it was error for the district court to have excluded three Government Accountability Office ("GAO") reports that they sought to use in their defense and that the district court erred in admitting the Government's summaries of the Appellants' bank records.   We review evidentiary rulings for abuse of discretion, subject to harmless error review. *United States v. Jackson*, 636 F.3d 687, 692 (5th Cir. 2011).  This same standard applies to our review of alleged errors in the administration of discovery rules. *United States v. Holmes*, 406 F.3d 337, 357 (5th Cir. 2005).

### 1.    Exclusion of the GAO Reports

Twice during the course of the trial, the Appellants tried to use the GAO reports that discussed information Medicare and its regional fiscal carriers gave to Medicare providers.   None of the reports specifically discussed Cahaba, Statewide's regional fiscal carrier.   The first time the Appellants tried to introduce the reports was as substantive evidence during the cross-examination of a Government witness .  The district court denied the reports' admission based on a lack of relevance.   Though relevance is a low threshold to meet, *United States v. Frick*, 588 F.2d 531, 537 (5th Cir. 1979), not all evidence is relevant evidence.

Evidence is relevant "if it tends to prove the point or fact for which it is offered (probative worth) and if the point or fact counts in the case (materiality)." Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 4:2; *see also* Fed. R. Evid. 401.  Appellants claim that the GAO reports tended to show that

the information that was given Medicare providers was often "incomplete, confusing, out-of-date, and/or incorrect." They contend that this tends to show that they acted in good faith as opposed to with criminal intent. Perhaps it could be argued that the GAO reports have some probative worth, but such probative worth is lessened considerably by the fact that they do not contain statements by Cahaba. *See Eason v. Fleming Cos.*, No. 92-1390, 1993 WL 360736, at \*5 (5th Cir. 1993); *see also United States v. Wiszowaty*, 506 F.3d 537, 540–41 (7th Cir. 2007). In light of the reports' limited probative worth, we cannot say that the district court abused its discretion by excluding the GAO reports as substantive evidence.

The Appellants later tried to establish that their Medicare expert relied on the GAO reports in forming his opinion. The district court denied the Appellants the ability to question their expert on them because the district court found that the Appellants had failed to disclose the GAO reports to the Government in violation of Federal Rule of Criminal Procedure 16. Rule 16 states that if the defendant requests expert disclosure from the government, then the defendant must, in turn, provide the government with "a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial . . . . This summary must describe the [expert] witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(b)(1)(C). Pearson's attorney admitted at trial that the GAO reports were not listed as something his expert would rely on in forming his opinions. Therefore, there was no error in finding the Appellants' Rule 16 disclosures insufficient. The Appellants also contend that it was an abuse of discretion to exclude the GAO Reports as a sanction for non-compliance with Rule 16. Any error on this front is, like with the GAO Reports exclusion as substantive evidence, harmless. The GAO Reports had, at best, limited probative worth; moreover, there was

overwhelming additional evidence of Appellants' guilt on theft of government funds (Count 12) and money laundering (Count 13), including testimony about the improper billing by area of the body and the bank records showing the money transfers from Statewide's account through subsidiaries and eventually into Jones's and Pearson's personal accounts. Therefore, the district court's exclusion of the GAO Reports is not reversible error.

### 2. Admission of the Government's Summaries of the Appellants' Bank Records

Appellants argue that the district court erred in admitting the Government's summaries of the Appellants' bank records under Federal Rule of Evidence 1006. Rule 1006 allows for "[t]he proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. The Appellants' objection was that for a summary to be admitted, all of the evidence that the summary intends to summarize must also be admitted. This is incorrect. *United States v. Valencia*, 600 F.3d 389, 417 (5th Cir. 2010) (explaining that evidence underlying a summary need not actually be admitted). Therefore, the district court's admission of the summaries of the Appellants' bank records was not error.[1]

---

[1] The Appellants claim that they also objected to the admission of the bank record summaries on the basis of hearsay because the Government never proved that the underlying bank records satisfied the business records exception to hearsay. Although the underlying evidence need not be admitted, evidence underlying a summary needs to be admissible. *See Hackett v. Hous. Auth. of City of San Antonio*, 750 F.2d 1308, 1312 (5th Cir. 1985). The objection here, however, was not specific enough to preserve the alleged error for our review. Fed. R. Evid. 103(a)(1). "The trial court must be apprised of the basis for objection with sufficient particularity to allow an informed decision to be made on the legal issue involved." *United States v. Greenfield*, 554 F.2d 179, 186 (5th Cir. 1977). The Appellants failed to sufficiently particularize their hearsay objection such that the district court was apprised of the issue.

## C.     Sufficiency of the Evidence

Appellants contend that there was insufficient evidence to support any of their convictions.[2]  "In considering whether there is sufficient evidence to support a verdict, this court asks only whether the jury's decision was rational, not whether it was correct." *United States v. Rodriguez*, 553 F.3d 380, 389 (5th Cir. 2008). "[T]his court examines whether a rational jury, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the offense to be satisfied beyond a reasonable doubt.  In reviewing the evidence presented at trial, we draw all reasonable inferences in favor of the jury's verdict." *United States v. Miles*, 360 F.3d 472, 476–77 (5th Cir. 2004) (citations omitted).

### 1.     Appellants' Convictions on Count 12 for Theft of Government Funds

Both of the Appellants were convicted of theft of government funds under 18 U.S.C. § 641.  Specifically, the Government alleged that the Appellants knowingly billed Medicare for services they knew were rendered improperly and/or for which they overbilled.  To convict the Appellants of theft of government funds, the jury would have needed to find that  the Appellants (1) converted (2) funds that belonged to Medicare, which (3) they knew were not theirs, and (4) did so with the intent to permanently deprive the United States of said funds. *See* 18 U.S.C. § 641.  This requires that the claims submitted were false and that at the time the Appellants submitted the claims, they knew the claims were false. Although § 641 only requires a "knowingly" standard, defined by the Supreme Court as "knowledge of the facts that constitute the offense," *Bryan v. United States*, 524 U.S. 184, 193 (1998), § 641 imposes knowledge of

---

[2] In addition to the sufficiency challenges discussed below, Pearson also claims that there was insufficient evidence to convict him on health care false statements  (Counts 7–11). In light of our decision regarding the lowered *mens rea* on Pearson's verdict form with respect to Counts 7–11, *see infra* II.D.2.a., we decline to consider Pearson's arguments on this issue.

non-entitlement or knowledge of wrongfulness, which makes the *mens rea* closer to "willfully." *See id.* at 191–92 ("[I]n order to establish a willful violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful." (internal quotation marks omitted)). Appellants claim that they reasonably believed that their use of unlicensed KTs and their billing by area of the body were legal. Therefore, to show that the Appellants knowingly converted the funds, the Government must show that the Appellants knew that their claims were false by proving the Appellants' interpretation of the law was not reasonable. *United States v. Whiteside*, 285 F.3d 1345, 1351 (11th Cir. 2002) (citing *United States v. Migliaccio*, 34 F.3d 1517, 1525 (10th Cir. 1994); *United States v. Johnson*, 937 F.2d 392, 399 (8th Cir. 1991); *United States v. Race*, 632 F.2d 1114, 1120 (4th Cir. 1980)).

Though there was some ambiguity in the Medicare regulations involving the use of unlicensed KTs to provide treatment without the direct supervision of a physician, the Government's proof as to the improper billing by area was sufficient to support the Appellants' convictions. The Appellants were provided a billing manual that laid out the codes for billing Medicare for treatments rendered. For example, the code for Therapeutic Activities (# 97530) states, "Therapeutic activities, direct, one or more, by the provider, use of dynamic activities to improve functional performance, each 15 minutes." The Government's witness as to Medicare's billing protocols gave uncontroverted testimony that the word "each" in the billing codes referred to unit of service and not area of the body. She also said that she did not believe that billing by areas was a reasonable interpretation and that the codes were clear. Moreover, there was other testimony about how Statewide's method of billing resulted in billing Medicare for ten hours of treatment in a single session, even though the treatment sessions were generally only one hour. Taking the evidence in the light most favorable to the jury's verdict, the Government sufficiently proved

that the Appellants' interpretation of the codes to justify billing by area of the body was not a reasonable one. Therefore, improper billing supports the Appellants' Count 12 convictions for theft of government property. *Cf. United States v. Prince*, 273 F. App'x 346, 348–49 (5th Cir. 2008) (sustaining a conviction under 18 U.S.C. § 1347 where the defendant claimed that billing by area of the body was embraced by the codes).

### 2.    Appellants' Convictions on Count 13 for Money Laundering

The Appellants also contend that there was insufficient evidence to support the jury's guilty verdict for both Appellants as to money laundering (Count 13). To convict the Appellants of money laundering, the jury would have needed to find that they (1) conducted financial transactions with (2) knowledge that the subject of the transactions was the proceeds from unlawful activity/crime—here, proceeds from submitting false Medicare claims—and (3) knowledge that the transactions were designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds. *See* 18 U.S.C. § 1956(a)(1)(B)(i); *see also United States v. Odiodio*, 244 F.3d 398, 403 (5th Cir. 2001).

The Government's theory as to money laundering was that because an investigator came to an in-home treatment session by Statewide, "flashed her badge," and asked some questions, the Appellants tried to move money out of Statewide's account. The Government's witness testified, based on the bank record summaries, that about a month after the agent showed up to a Statewide treatment, two million dollars were transferred from Statewide's bank account to another Statewide account belonging to Statewide Rehabilitation Services. The funds were then transferred to Premier Dialysis, a Statewide subsidiary, and finally, one million dollars each were transferred to Jones's and Pearson's personal accounts. The Government witness also testified that this was the first time that Jones and Pearson paid themselves through this roundabout method.

No. 10-60944

As stated above, the Government sufficiently proved that the Appellants had knowledge that they were improperly billing Medicare based on areas of the body. Additionally, from the evidence about the way the Appellants moved this two million dollars between various accounts, the jury could infer that these transactions were designed to conceal or disguise the source of the proceeds. *See United States v. Burns*, 162 F.3d 840, 848–49 (5th Cir. 1998) ("Evidence that may be considered when determining whether a transaction was designed to conceal includes . . . depositing illegal profits in the bank account of a legitimate business."); *United States v. Willey*, 57 F.3d 1374, 1386 (5th Cir. 1995) ("Evidence that the defendant commingled illegal proceeds with legitimate business funds has been held to be sufficient to support the design element."). Therefore, there was sufficient evidence to convict the Appellants of money laundering.

**D. Jury Issues**

**1. Jury Instructions**

The Appellants further claim error because of the district court's jury instructions. A district court's failure to give a proposed jury instruction is reviewed for abuse of discretion, subject to harmless error review. *United States v. Edelkind*, 525 F.3d 388, 397 (5th Cir. 2008). "The district court retains substantial latitude in formulating its jury charge, and we will reverse only if the requested instruction is substantially correct; was not substantially covered in the charge as a whole; and if the omission of the requested instruction seriously impaired the defendant's ability to present a given defense." *Id.* (internal quotation marks omitted). The Appellants claim that it was error for the district court to have improperly instructed the jury as to the requisite knowledge; to have not instructed the jury on entrapment by estoppel, ambiguity, and good faith; and to have not included a limiting instruction as to one of the Government witness's testimony.

14

No. 10-60944

### a.    Knowledge

The Appellants each assert, though for different reasons, that they were entitled to a more specific instruction as to the definition of "knowingly," and that it was error for the district court to have instructed the jury on deliberate indifference.  Pearson argues that because he did not deal with billing, he did not have the requisite knowledge about the claim submissions.  Jones argues that she was only responsible for billing, and therefore, she did not have the requisite knowledge about the allegedly improper methods of treatment Statewide used.  With respect to Jones, we have found that there was sufficient evidence to sustain her convictions based on her improper billing; therefore, the lack of a specific instruction about her knowledge about the allegedly improper treatment is harmless. *Edelkind*, 525 F.3d at 397.  As to Pearson, there was testimony that he was actively involved in all aspects of Statewide's operations such that he knew how Medicare was being billed.  Therefore, his requested instruction was not substantially correct and thus, there was no error in not submitting that instruction to the jury.  *Id*.

The district court gave an instruction on deliberate indifference as a part of its charge on "knowingly," which was consistent with this circuit's pattern jury instructions. *See Fifth Circuit Pattern Jury Instructions: Criminal* § 1.37 (2001). "In reviewing whether an instruction was supported  by the evidence, we view the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the Government." *United States v. Wofford*, 560 F.3d 341, 352–53 (5th Cir. 2009) (internal quotation marks omitted).  "[T]he instruction is proper where the evidence shows (1) subjective awareness of a high probability of the existence of illegal conduct, and (2) purposeful contrivance to avoid learning of the illegal conduct." *Id*. at 352.  Such circumstances are "rare," *United States v. Mendoza-Medina*, 346 F.3d 121, 132 (5th Cir. 2003), because "the district court should not instruct the jury on

15

No. 10-60944

deliberate ignorance when the evidence raises only the inferences that the defendant had actual knowledge or no knowledge at all of the facts in question." *United States v. Conner*, 537 F.3d 480, 487 (5th Cir. 2008) (internal quotation marks omitted).  Deliberate indifference instructions are inappropriate in the usual case, where the evidence presents a simple choice "between a version of the facts in which the defendant had actual knowledge, and one in which the defendant was no more than negligent or stupid." *Id.* (quoting *United States v. Lara-Velasquez*, 919 F.2d 946, 951 (5th Cir. 1990)).  The key evidence that must be present for a deliberate indifference instruction to be appropriate is evidence of *conscious* action to avoid knowledge of illegal conduct, *Lara-Velasquez*, 919 F.2d at 951, because "[t]he purpose of the deliberate [indifference] instruction is to inform the jury that it may consider evidence of the defendant's charade of ignorance as circumstantial proof of guilty knowledge." *Id.*; *see also United States v. Nguyen*, 493 F.3d 613, 618 (5th Cir. 2007).  That said, where as here, there is "substantial evidence of actual knowledge," the inclusion of a deliberate indifference cannot be reversible error.  *Wofford*, 560 F.3d at 354 (internal quotation marks omitted).  As discussed above, there was substantial evidence of the Appellants' actual knowledge; therefore even assuming that there was error in instructing the jury as to deliberate indifference, such error is harmless.[3]

### b.  Entrapment by Estoppel

Appellants claim error based on the district court's rejection of their proposed instruction as to entrapment by estoppel.  They argue that Cahaba's

---

[3] The Appellants also urge error based on the lack of a balancing instruction to counteract the deliberate indifference instruction.  Though in *United States v. Farfan-Carreon*, 935 F.2d 678, 681 n.5 (5th Cir. 1991), we voiced our approval for such a balancing instruction, the *Farfan-Carreon* court, notably, did not reverse for failure to include such a balancing instruction.  In this case, the deliberate indifference instruction was tempered by the fact that the district court instructed the jury that "knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish." Therefore, there was no error in not giving the jury the Appellants' proposed balancing instruction.

letter to Dr. Dunk Ellis, one of the doctors affiliated with Statewide, which stated that information gleaned from Cahaba's probe would help Cahaba develop a "Progressive Corrective Action Plan," led them to believe that absent notification from Cahaba, their conduct was permissible. "The defense of entrapment by estoppel is applicable when a government official or agent actively assures a defendant that certain conduct is legal and the defendant reasonably relies on that advice and continues or initiates the conduct." *United States v. Spires*, 79 F.3d 464, 466 (5th Cir. 1996). Even assuming that Cahaba is an "authorized agent of the federal government who has been granted the authority from the federal government to render such [claimed erroneous] advice," *id.* at 467, there is no evidence that the Appellants actually relied on this letter. Absent this evidentiary predicate, it was not error for the district court to refuse this instruction.

### c. Ambiguity

Appellants argue that the district court erred in failing to include their proposed ambiguity instruction in the charge to the jury. Though the thrust of the Appellants' defense was that the Medicare regulations were ambiguous, the proposed ambiguity instruction is not a substantially correct statement of the law. Appellants' instruction would have required the Government to go farther than the law requires as it would have instructed the jury that "the government must rule out the possibility that the defendant was acting in reliance on [a claimed reasonable] interpretation [of the law]." The law only requires that "[i]n a case where the truth or falsity of a statement centers on an interpretive question of law, the government bears the burden of proving beyond a reasonable doubt that the defendant's statement is not true under a reasonable interpretation of the law." *Whiteside*, 285 F.3d at 1351. This standard does not speak to ruling out defendant's reliance on the interpretation; it only speaks to ruling out that it was a reasonable one. Because Jones's and Pearson's

17

instruction was not a substantially correct statement of the law, the district court did not err in refusing to include it. *Edelkind*, 525 F.3d at 397.

### d. Good Faith

Appellants next claim error based on the district court's denial of a good faith instruction as to theft of government funds and money laundering (Counts 12 and 13, respectively).[4]  Like the ambiguity instruction discussed above, *see supra* II.D.1.c., the Appellants' proposed instruction was not a substantially correct statement of the law.  The instruction the Appellants proposed stated, "If in good faith the defendant[s] . . . believed that [their] statements or representations were not false or fraudulent, then [they] cannot be guilty."  This instruction deals with the Appellants' belief about the law, but the burden on the Government was only to show that the belief that the Appellants relied on was not reasonable.  *See Whiteside*, 285 F.3d at 1351.  This instruction would have allowed the jury to acquit even if the Appellants relied on an unreasonable interpretation of the Medicare regulations so long as it was sincerely held. Therefore, it was not error for the district court not to include a good faith instruction on Counts 12 and 13.

### e. Limiting Instruction

In response to the testimony by a Government witness about the interplay of the Medicare regulations, state requirements under those regulations, and the federal crimes with which the Appellants were charged, the Appellants asked for a limiting instruction.  The goal of the limiting instruction was to ensure that the jury kept the issue of state requirements separate from the federal crimes

---

[4] Pearson also claims that it was error for the district court to use a more limited good faith instruction as to the health care false statements  (Counts 7–11).  The district court rejected Pearson's proposed instruction because it found that its grant of a more limited instruction and the other instructions substantially covered what the proposed instruction sought.  In light of our decision regarding the lowered *mens rea* on Pearson's verdict form with respect to Counts 7–11, *see infra* II.D.2.a., we decline to consider Pearson's arguments on this point of error.

charged. The district court decided against issuing a limiting instruction because it felt that such an instruction would have been an unreasonable comment on the evidence. We have previously "recognized the value of limiting instructions in attenuating any improper effect of such evidence when used for a permissible purpose." *United States v. Brechtel*, 997 F.2d 1108, 1115 (5th Cir. 1993). Jury instructions, however, must be considered as a whole. *Conner*, 537 F.3d at 486. In the final instructions to the jury, the district judge cautioned, "You[, the jury] are here to decide whether the government has proved beyond a reasonable doubt that the defendant's [sic] are guilty of the crime charged. The defendants are not on trial for any act, conduct, or offense not alleged in the indictment." This instruction sufficiently articulated to the jury that they were only to consider the federal crimes charged and not any of the state rules and regulations that were discussed. Therefore, the lack of the inclusion of the Appellants' requested limiting instruction did not "seriously impair[] the [Appellants'] ability to present a given defense," and it was not error for the district court to have denied the Appellants' requested limiting instruction. *Edelkind*, 525 F.3d at 397.

### 2. Verdict Form

Review of verdict form issues by this Court is for abuse of discretion, *Travelers Cas. & Sur. Co. of Am. v. Ernst & Young LLP*, 542 F.3d 475, 489 (5th Cir. 2008), subject to harmless error review. *United States v. Nguyen*, 493 F.3d 613, 622 (5th Cir. 2007).

### a.    Knowledge on Counts 7–11 (Health Care False Statements) as to Pearson

Pearson contends that the language used on his verdict form with respect to the health care false statement counts (Counts 7–11) was erroneous. Section 1035 of Title 18 of the United States Code defines the *mens rea* for the crime of health care false statements as "knowingly and willfully," 18 U.S.C. 1035, but

the verdict form charged that the jury could find Pearson guilty if he "knew, or should have known, that the services billed by [Statewide], were not provided by a physician or under the direct supervision of a physician, as required by Medicare." Therefore, the level of *mens rea* included on the verdict form was less than required by § 1035. *Compare Bryan*, 524 U.S. at 191–92 (defining "willfully") *with United States v. Garrett*, 984 F.2d 1402, 1412 (5th Cir. 1993) (describing "should have known" as "the minimum level of *scienter*"). This is an abuse of discretion. *See McClure v. Ashcroft*, 335 F.3d 404, 408 (5th Cir. 2003) (stating that it is an abuse of discretion to "rel[y] on erroneous conclusions of law"). Moreover, this was not an error that can be considered harmless because this case centered on proving that Pearson had the requisite knowledge that his billing under the Medicare regulations was illegal to convict him of fraud. Therefore, the lowered *mens rea* on the verdict form with respect to Counts 7–11 was reversible error.

### b.  Level of Detail on Count 13 (Money Laundering)

The Appellants argue that the inclusion of some of the language from the indictment without including any cautionary language made the verdict form amount to a peremptory instruction. A peremptory instruction is "[a] court's explicit direction that a jury must obey, such as an instruction to return a verdict for a particular party." Black's Law Dictionary 936 (9th ed. 2009). It is clear that the issuance of a peremptory instruction in a criminal case is wrong, *see United Bhd. of Carpenters & Joiners of Am. v. United States*, 330 U.S. 395, 408 (1947), but the language included on the Appellants' verdict form was not a peremptory instruction. The Appellants cite *United States v. Overholt*, 307 F.3d 1231 (10th Cir. 2002), for the proposition that "[t]he purpose of the verdict form is not to repeat the elements of the offense," but there, the Tenth Circuit found that "[t]he jury could not possibly have been misled into believing that it could ignore the elements instruction." *Id*. at 1248. The same is true here. The

language on the verdict form about what the financial transactions were could not have so misled the jury such that they would ignore their charge from the district court. This is factually distinct from the situation with the lowered level of *mens rea* on Counts 7–11 because there, the verdict form expressly contradicted what the district court said in its charge. Because the district court included additional detail on the verdict form but did not change the requisite proof to convict the Appellants of money laundering, we find no reversible error.

### c.  Both Appellants on a Single Form

Finally, with respect to the verdict from, the Appellants urge error based on the fact that both of the Appellants' names appeared on the same verdict form.  While the issuance of "limiting instructions and[/or] separate verdict forms for each defendant [may help] to minimize any prejudice," *United States v. Angwin*, 271 F.3d 786, 796 (9th Cir. 2001), the Appellants can point to no case where the failure to issue separate verdict forms constituted reversible error. Here, the verdict forms were specifically and clearly labeled as applying to only one defendant, and therefore, we find no abuse of discretion on this basis.

### 3.  Jury Interaction

Appellants claim that the district court erred by communicating *ex parte* with the jury on four separate instances.  Although we have not explicitly articulated the standard of review for such claims, the language of our precedents suggests that the standard is abuse of discretion, subject to harmless error review, and we now hold that it is.  *United States v. Bieganowski*, 313 F.3d 264, 293 (5th Cir. 2002) (applying harmless error analysis to the review of improper *ex parte* jury communications); *United States v. Cantu*, 185 F.3d 298, 305–06 (5th Cir. 1999) ("The district court enjoys wide latitude in deciding how to respond to questions from a jury.").  In determining that the standard is abuse of discretion, we do not, however, abandon our previous statement that the controlling law "affords little tolerance for any ex parte meeting between judge

and juror during deliberations, and statements that seem innocuous at first glance may[—]in the law's eye[—]be improperly influential." *United States v. Peters*, 349 F.3d 842, 848 (5th Cir. 2003) (remarking about *United States v. Gypsum Co.*, 438 U.S. 422 (1978), and *United States v. Cowan*, 819 F.2d 89 (5th Cir. 1987)).

The first instance of *ex parte* communication occurred when the jury asked about Statewide's business model. The jury sent out a note asking: "'Is there a copy of [Statewide's] business model in evidence? If so, where can we find it?'" The district court responded by stating: "If it is not in the evidence, then it is not available for your use. I cannot point you to any specific evidence, but you should consider all of the evidence presented, including the testimony presented." Pearson's counsel objected once he was informed about it.

The second instance occurred after the jury sent out a note describing the troubles they were having coming to a verdict as to each Appellant on Counts 2–12. During a conference with the attorneys about this note, the district judge excused himself to try to address the question. The district judge returned two minutes later and told the attorneys: "I asked the jury. They walked around and everybody was calm. And I said, do y'all still need me to respond to your question? And one of the ladies said, we have got a system where we are talking. So I'm leaving it like that. They don't have a question anymore. So we will continue."

The next day, the district court received another note from the jury. This one said, "'Sir, I would like to talk to you about an issue I'm having with one of the jurors.," to which the district court responded, "I stuck my head in and said, I cannot talk to any jurors. I will have to bring you back in the courtroom." Later that day, the final court-jury communication occurred. The district court told counsel the following:

No. 10-60944

> I knocked on the door and asked the jury about how long they
> wanted to work tonight, thinking about supper and all, and they
> said, we think we are ready to go home. They said, we will not
> finish tonight and may not finish tomorrow. . . . So with that said,
> I'm going to bring the jury back in and I'm send [sic] them home for
> the night."

We reemphasize that *ex parte* communications between judge and jury are to be avoided because as the Supreme Court warned in *United States v. Gypsum Co.,* "[a]ny ex parte meeting or communication between the judge and the foreman of a deliberating jury is pregnant with possibilities for error." 438 U.S. at 460. In this case, the communications alleged as error by the Appellants are harmless. Unlike *Gypsum Co.*, *Cowan*, and *Peters*, there is absolutely nothing in the record that raises even an inference of prejudice. Therefore, although we again caution district judges against engaging in any communication with the jury absent the defendant or counsel present, none of these communications rises to the level of reversible error.

### 4. Submission of Forfeiture

The Appellants claim that in its Motion to Bifurcate, the Government requested that the jury determine the forfeiture issue per Federal Rule of Criminal Procedure 32.2(b)(5) but then later failed to have the jury determine the forfeiture issue. The Government contends that the Motion to Bifurcate did not, in fact, request this. Looking at the language of the motion, it does not appear that the Government made a request under Rule 32.2 such that the jury would have to determine the forfeiture issue as well. The motion only asks that the guilt and forfeiture phases of the trial be bifurcated "[i]n the interests of judicial economy and avoiding confusion on the part of the jury." It never a requests under Federal Rule of Criminal Procedure 32.2(b)(5)(A) to retain the jury to decide the forfeiture issue. It instead states that "unless and until the jury returns a guilty verdict on these counts, there is no basis for the jury to then

23

consider the issue of criminal forfeiture." It also reminds the district court that "Rule 32.2(b) provides that this factual determination shall be made by the court unless a party requests that the jury determine the issue." This language likely would not appear if the Government had actually intended to make a request through this motion.

### E.   Sentencing Issues

Issues related to a defendant's sentence are reviewed for reasonableness. *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008). This reasonableness determination takes the form of abuse of discretion review. *Id*. There is a two-step process for this review: "first[,] ensure that the district court committed no significant procedural error" and second, "consider[] the substantive reasonableness of the sentence imposed." *Id*. (internal quotation marks omitted). In going through this two-step process, "a district court's interpretation or application of the Sentencing Guidelines is reviewed de novo, and its factual findings are reviewed for clear error." *Id*. (internal quotation marks omitted).

#### 1.  Sentencing Entrapment

The Appellants claim that their sentence was greater because the Government, through Cahaba, failed to inform them of their illegal practices when it decided the practices were irregular in December 2001. "Sentencing entrapment or sentence factor manipulation occurs when a defendant, although predisposed to commit a minor or lesser offense, is entrapped in committing a greater offense subject to greater punishment." *United States v. Staufer*, 38 F.3d 1103, 1106 (9th Cir. 1994) (internal quotation marks omitted). "Although this Court apparently has not expressly determined whether we have accepted the concept of sentencing factor manipulation, [it has] addressed a similar contention in the context of a due process claim." *United States v. Tremelling*, 43 F.3d 148, 151 (5th Cir. 1995) (internal quotation marks omitted). There is,

however, no proof that Cahaba did anything besides follow routine practice of referring determinations of "potential fraud" for investigation. This is not the type of "overbearing and outrageous conduct" that we considered as a potential basis for a finding of sentencing entrapment. *Id.*; *see also United States v. Washington*, 44 F.3d 1271, 1279–80 (5th Cir. 1995) (refusing to decide on the merits of the "trendy" claim of sentencing entrapment). Therefore, though we decline to decide whether or not sentencing entrapment is an acceptable basis on which to challenge a conviction, we find that even if we did accept it, the Appellants cannot meet its requirements so as to merit relief.

### 2. Sentencing Miscalculation

Lastly, the Appellants urge error because the district court refused to credit any of the alleged value provided by Statewide's treatments against the loss that the district court found. *See* U.S. Sentencing Guidelines Manual § 2B1.1 cmt. n.3(E) (2010). They argue that the factual finding that Statewide's treatment had no value was clearly erroneous. The district court based its guidelines calculation for both Appellants on the entire $18,068,447.73 that Medicare paid Statewide. It did so because the treatments "had no monetary value insofar as the Medicare and Medicaid laws are concerned." The Appellants claim that their treatment provided value to their patients, but this confuses who the victim is for the purposes of the offense charged. Here, the Appellants were convicted of defrauding the government (Medicare); therefore, the government is the relevant victim for Note 3(E) to § 2B1.1. Medicare pays for treatments that meet its standards, and the Appellants' treatments using unlicensed KTs did not meet these standards. Consequently, Medicare received no value from the Appellants' treatments and the district court did not err in calculating the loss amount.

No. 10-60944

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM the Appellants' convictions for theft of government funds and money laundering (Counts 12 and 13, respectively) but REVERSE Pearson's convictions for health care false statements (Counts 7–11) due to lowered level of *mens rea* on the verdict form.